1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   NATIONAL WILDLIFE FEDERATION,

11              Plaintiff,

12        v.

13   FEDERAL EMERGENCY
     MANAGEMENT AGENCY,

14              Defendant,

15

16   THE CITIES OF ARLINGTON,
     AUBURN, BURLINGTON, EVERETT,

17   FEDERAL WAY, KENT, LAKE
     FOREST PARK, MOUNT VERNON,

18   NORTH BEND, ORTIN, PORT
     ANGELES, PURALLUP, RENTON,

19   SNOQUALMIE, SULTAN, and
     TUKWILA,

20

21              Defendant-Intervenors,

22   PROPERTY OWNERS FOR SENSIBLE
     FLOODPLAIN REGULATION,

23

              Defendant-Intervenor.

24

CASE NO. C11-2044-RSM

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANT FEDERAL
EMERGENCY MANAGEMENT
AGENCY'S MOTION FOR
SUMMARY JUDGMENT

ORDER- 1

# I. INTRODUCTION

Plaintiff National Wildlife Federation ("NWF") brought suit against the Federal Emergency Management Agency for violations of the Endangered Species Act in its implementation of the National Flood Insurance Program. Before the Court is NWF's Motion for Summary Judgment (Dkt. # 74), and Defendant FEMA's cross Motion for Summary Judgment (Dkt. # 84). Intervenor Defendant Property Owners for Sensible Floodplain Regulation opposed NWF's motion (Dkt. # 90) and Intervenor Defendant Cities filed an opposition and cross motion (Dkt. # 92). Oral argument was held on March 14, 2014 and again on May 12, 2014. For the reasons set forth below, NWF's motion will be denied and FEMA's motion will be granted. To the extent the Defendant Cities motion joins FEMA's cross motion for summary judgment, it will be granted on the grounds stated below.

# II. STATUTORY FRAMEWORK

This case involves the interaction of two congressional mandates: the National Flood Insurance Act of 1968, 42 U.S.C. §§ 4001-4129, and the Endangered Species Act ("ESA") of 1973, 16 U.S.C. §§ 1531-1544.

## A.  The National Flood Insurance Act

Prior to 1968, there was a growing concern that the private insurance industry was unable to offer reasonably priced flood insurance on a national basis. *See* 42 U.S.C. § 4001(a), (b); *Flick v. Liberty Mut. Fire Ins. Co.,* 205 F.3d 386, 388 (9th Cir. 2000).  Congress passed the National Flood Insurance Act ("NFIA") of 1968 to address this concern.  The purposes of the NFIA were to provide affordable flood insurance throughout the nation, encourage appropriate land use that would minimize the exposure of property to flood damage and loss, and thereby reduce federal

1  expenditures for flood losses and disaster assistance.  42 U.S.C. § 4001(d)-(f); *Florida Key Deer*

2  *v. Paulison,* 522 F.3d 1133, 1136 (11th Cir. 2008);  *Flick v. Liberty Mut. Fire Ins. Co.,* 205 F.3d

3  386, 388 (9th Cir. 2000).   To that end, the NFIA authorized the Federal Emergency

4  Management Agency ("FEMA") to establish and carry out the National Flood Insurance

5  Program ("NFIP").  42 U.S.C. § 4011.

6         There are three basic components of the NFIP: (1) the identification and mapping of

7  flood-prone communities, (2) the requirement that communities adopt and enforce floodplain

8  management regulations that meet minimum eligibility criteria in order to qualify for flood

9  insurance, and (3) the provision of flood insurance.  *Nat'l Wildlife Federation v. Federal*

10  *Emergency Management Agency,* 345 F. Supp. 2d 1151, 1155 (2004).  FEMA also implements a

11  Community Rating System ("CRS"), which provides discounts on flood insurance premiums in

12  those communities that establish floodplain management programs that exceed NFIP's minimum

13  eligibility criteria.  *Id.*  The NFIA encourages community participation in the NFIP by

14  prohibiting federally-regulated banks or lenders, or federal agencies, from providing loans or

15  other financial assistance for acquisition or development within flood hazard areas of non

16  participating communities and by requiring that flood insurance be purchased as a precondition

17  for such financial assistance.  Declaration of Jan Hasselman, Ex. 1 (the "BiOP"), p. 2.

18  1.   Mapping

19         FEMA is tasked with identifying and publishing information regarding "all flood plain

20  areas, including coastal areas located in the United States, which have special flood hazards."  42

21  U.S.C. § 4101.  A Special Flood Hazard Area or "SFHA" is "the land within the flood plain

22  within a community subject to a 1 percent or greater chance of flooding in a given year."  44

23  C.F.R. § 59.1.  FEMA puts data regarding the locations of SFHA and regulatory floodways on

24

1   Flood Insurance Rate Maps ("FIRMs").  The FIRMS, in turn, provide the basis both for the

2   requirement that a developer obtain flood insurance as well as the calculation of the actual flood

3   insurance rate for any new construction.

4        FEMA is required to assess the need for revisions and updates of FIRMs "based on an

5   analysis of all natural hazards affecting flood risks."  42 U.S.C. § 4101(e)-(f).  However, state

6   and local governments may request map revisions by submitting sufficient technical data to

7   justify the request.  *See* 42 U.S.C. § 4101(f)(2).  In addition, FEMA has promulgated regulations

8   that allow individual landowners to request map changes, called Letters of Map Change

9   ("LOMC"), de-designating property as within the SFHA.  *See* 44 C.F.R. §§ 65.4-65.8, 44 C.F.R.

10  Part 72; 42 U.S.C. § 4104.  The letters are issued when a physical structure or the placement of

11  earthen fill has raised the property outside the SFHA so that it is no longer subject to the 1%

12  annual chance of flooding.  44 C.F.R. § 72.2.  A LOMC may also be issued when there is an

13  official determination by FEMA that a property has been inadvertently included in the SFHA or

14  regulatory floodway.  44 C.F.R. Part 70.  Finally, a community or individual may request

15  FEMA's comments as to whether a proposed project, if built as proposed, would result in a flood

16  map revision.  FEMA's comments in response to such a request are issued in the form of a

17  Conditional Letter of Map Change (CLOMC").  44 C.F.R. § 65.8, Part 70, Part 72.

18  2.   Minimum Eligibility Requirements

19       To qualify for the program, communities must adopt land use controls at least as

20  restrictive as the minimum criteria established by FEMA.  *See* 42 U.S.C.§ 4102(c).  FEMA

21  promulgated regulations setting forth the minimum floodplain management criteria required by

22  the NFIA in 1976.  42 U.S.C. § 4129; 41 Fed. R.eg. 46,975 (Oct. 26, 1976).  Under these

23  regulations, in order to qualify for insurance under the NFIP, a participating community must

24                                                4

adopt and enforce a floodplain management ordinance that meets or exceeds regulatory criteria. 44 C.F.R. §§59.2(b), 59.22(a)(3), 60.1.  The criteria apply to all areas within a community that are mapped as within the SFHA.  A community that fails to adequately enforce its flood plain management ordinance may be put on probation or suspended from the NFIP.  44 C.F.R. §59.24(b)-(c).

3.    Provision of Flood Insurance

FEMA must provide flood insurance to communities which have "evidenced a positive interest in securing flood insurance coverage under the flood insurance program" and have "given satisfactory assurance that ... adequate land use and control measures will have been adopted ... which are consistent with the comprehensive criteria for land management and use developed" under 42 U.S.C. § 4102. 42 U.S.C. § 4012(c).

4.    Community Rating System

FEMA is authorized "to carry out a community rating system program, under which communities participate voluntarily ... to encourage adoption of more effective measures that protect natural and beneficial floodplain functions," among other goals. 42 U.S.C. § 4022(b)(1). FEMA's CRS provides discounts on flood insurance premiums in communities that establish floodplain management programs that go beyond the NFIP's minimum eligibility criteria.

**B.  The Endangered Species Act**

Section 7(a)(2) of the ESA requires federal agencies to "ensure" that their actions do not cause "jeopardy" to endangered or threatened species. 16 U.S.C. § 1536(a)(2).  To cause jeopardy is to "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild." 50 C.F.R. § 402.02.  The federal agency undertaking such an activity must consult the service having jurisdiction over the relevant endangered species.  The U.S. Fish and

1   Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), are jointly

2   responsible for administering the ESA and the scope of their respective jurisdictions is set forth

3   in 50 C.F.R. § 402.01(b) (1987).  Here, the service involved is the NMFS.

4         Under the Act, following consultation, the service must issue a biological opinion that

5   details how the proposed action "affects the species or its critical habitat," including the impact

6   of "incidental takings" of the species.  An incidental taking "refers to takings that result from, but

7   are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency

8   or applicant."  50 C.F.R. § 402.02.  If a species might be endangered by the agency action, the

9   service suggests a "reasonable and prudent alternative" ("RPA") to the agency's proposal.  16

10  U.S.C. at § 1536(b)(3)(A).  "The agency is not required to adopt the alternatives suggested in the

11  biological opinion; however, if the Secretary deviates from them, he does so subject to the risk

12  that he has not satisfied the standard of section 7(a)(2)."  *Tribal Village of Akutan v. Hodel,* 869

13  F.2d 1185, 1193 (9th Cir. 1988) (citing *Village of False Pass v. Watt,* 565 F. Supp. 1123, 1160-

14  61 (D. Alaska 1983), *aff'd,* 733 F.2d 605 (9th Cir. 1984)).  Thus, "section 7(a)(2) imposes two

15  obligations upon federal agencies. The first is procedural and requires that agencies consult with

16  the NMFS or FWS to determine the effects of their actions on endangered or threatened species

17  and their critical habitat.  The second is substantive and requires that agencies insure that their

18  actions not jeopardize endangered or threatened species or their critical habitat."  *Florida Key*

19  *Deer v. Paulson*, 522 F.3d 1133, 1138 (11th Cir. 2008) (citing 16 U.S.C. § 1536(b) & (a)(2)).

20                      **III. PROCEDURAL HISTORY**

21    **A.  The 2003 Litigation**

22        In 2003, Plaintiff National Wildlife Federation ("NWF") brought suit against FEMA,

23  alleging that FEMA was in violation of the Endangered Species Act for failing to comply with its

1   procedural obligation under 16 U.S.C. § 1536(a)(2) to consult with the NMFS on impacts of the

2   NFIP to the Puget Sound Chinook salmon, a threatened species.  *See NWF v. FEMA,* 345 F.

3   Supp. 2d at 1151.  Section 7 requires every federal agency to engage in consultation to "insure

4   that any action authorized, funded or carried out by such agency … is not likely to jeopardize the

5   continued existence of any endangered species or threatened species or result in the destruction

6   or adverse modification of habitat of such species."  16 U.S.C.A. § 1536(a)(2).

7          Although FEMA did not have discretion to deny insurance to a person in an otherwise

8   eligible community, the Court concluded that FEMA did have discretion in its mapping

9   activities, discretion to amend its regulations establishing the minimum eligibility criteria to

10  qualify for flood insurance, and discretion to promote conservation measures through the CRS.

11  *NWF v. FEMA,* 345 F. Supp. 2d at 1168-1174.  In addition, the Court found substantial evidence

12  that FEMA's implementation of NFIP in the Puget Sound region "may affect" Chinook salmon.

13  As a result, FEMA was held in violation of the ESA and was ordered to initiate consultation with

14  NMFS within sixty days.

15         Pursuant to the Court's order, FEMA initiated consultation with NMFS in 2004.  After

16  four years of scientific review and inter-agency negotiations, on September 22, 2008, NMFS

17  issued a 226-page biological opinion on the impacts of the NFIP on ESA-listed species in the

18  Puget Sound region.  *See BiOp.*  The BiOp concluded that implementation of the NFIP

19  jeopardized the survival of not only Puget Sound Chinook salmon, but also Puget Sound

20  steelhead, Hood Canal chum salmon, and Southern Resident killer whales.  BiOp at 150.  The

21  BiOp also concluded that continued implementation of the NFIP would destroy or adversely

22  modify critical habitat for Puget Sound Chinook salmon, Hood canal chum salmon, and Southern

23  Resident killer whales.  *Id.*

24                                              7

**B.   The 2008 Biological Opinion**

Pursuant to its obligations under the ESA, NMFS presented FEMA with a Reasonable and Prudent Alternative to the NFIP to ensure that the action did not cause jeopardy to the listed species or adversely modify their critical habitat.   The RPA consists of seven elements, summarized as follows:

1. **Notification.**  FEMA was instructed to notify all 122 NFIP communities in the Puget Sound region within 30 days that "development consistent with the NFIP jeopardizes the listed species and adversely modifies their critical habitat."  BiOp at 151.  The notification was to suggest measures for avoiding and minimizing take.

2. **Mapping.**  This element directed FEMA to make multiple changes to its mapping program.  Most significantly, FEMA was instructed to process LOMC only when the proponent demonstrated "that the alteration avoids habitat functional changes, or that the proponent has mitigated" for such changes.  BiOp at 152-53.  FEMA was also directed to address effects that could occur later in time; to prioritize mapping activities based on the presence of salmon; and to increase the accuracy of maps through use of on-the-ground data and consideration of "future conditions," including climate change. *Id.*

3. **Floodplain Management Criteria.**  This element directed FEMA to revise its floodplain management criteria.  BiOp at 154.

4. **Community Rating System.**  This element directed FEMA to change the CRS to increase points for salmon-friendly measures and decrease points for measures that reduce flood risk but harm habitat, such as through the use of levees. *Id.* at 158-59.

8

5. **Levee Vegetation and Construction.**  This element called for four specific changes, to be implemented within one year. *Id.* at 160-62.  (1) FEMA was prohibited from recognizing levees that are certified by the Army Corps of Engineers unless it is demonstrated that the standard will not adversely affect species or habitat.  (2) FEMA was directed to revise its procedures so that levee owners that opt out of the Corps' funding program and maintain vegetation remain eligible for emergency funding.  (3) FEMA was directed to use, and encourage grantees to use, Hazard Mitigation grant funding and the Flood Mitigation Assistance Program for projects that reduce flood risk and also benefit salmon.  (4)  FEMA was instructed to recognize new levees and floodwalls only if they include certain habitat-protecting features.

6. **Mitigation.**  For development in floodplains that degrade habitat during the period prior to full implementation of the RPA, FEMA was instructed to "ensure" that appropriate mitigation occurs. *Id.* at 162.

7. **Monitoring and Adaptive Management.**  FEMA was directed to undertake regular monitoring and reporting of progress towards each of the other RPA elements.  *Id.*

In addition to the seven-element RPA outlined above, the BiOp also includes an Incidental Take Statement, which insulated FEMA and participating communities from liability under Section 9 of the ESA if they complied with the RPA.  *Id.* at 168-175.

## C.  The 2011 Litigation

Before the Court is NWF's second suit against FEMA concerning FEMA's implementation of the BiOp. There is no dispute that FEMA has complied with its procedural obligations under the ESA and the Court's 2004 order to consult with the NMFS.  However, more than three years after the NMFS issued the BiOp, the parties dispute whether FEMA has

1  properly implemented the 7-element RPA contained in the BiOp such that it is no longer

2  jeopardizing the continued existence of ESA-listed species causing the destruction of their

3  critical habitat.

4      The court has already considered, and denied, NWF's previous motion for a preliminary

5  injunction on the ground that NWF failed to demonstrate a likelihood of irreparable injury. Dkt.

6  # 69. NWF now moves the Court to issue a declaratory judgment that FEMA's implementation

7  of NFIP violates § 7(a)(2) of the ESA. NWF seeks summary judgment on a single claim for

8  relief: a § 7(a)(2) violation of the ESA, 16 U.S.C. § 1536(a)(2).[1] It contends that FEMA's current

9  implementation of the NFIP in the Puget Sound Region fails to "ensure against jeopardy" to

10 protected salmon and orcas. Specifically, NWF challenges FEMA's implementation of RPA

11 Elements 2, 3, 5, 6, and 7.[2] FEMA has cross moved for summary judgment seeking a

12 determination by the Court that it has complied with its substantive obligations under the RPA.

13 The cities of Arlington, Auburn, Burlington, Everett, Federal Way, Kent, Lake Forest Park,

14 Mount Vernon, North Bend, Orting, Puyallup, Renton, Snoqualmie, Sultan, and Tukwila

15 (collectively the "Cities"), as well as the non-profit organization Owners for Sensible Floodplain

16 Regulation ("POSFR"), oppose Plaintiff's motion as intervenor defendants. Both FEMA and the

17 intervenor Cities have cross-moved for summary judgment and seek dismissal of the Complaint

18 in its entirety.

19

20

21

22 [1] NWF also seeks voluntary dismissal without prejudice of its second and third claims for relief
   pursuant to Fed. R. Civ. P. 41(a)(2). Dkt. # 74, p. 7 n.2.

23 [2] During the briefing period, FEMA informed NWF that it had satisfied its obligation under RPA
   Element 4. FEMA has since acknowledged NWF's compliance.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, however, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). Courts have found that since the ESA does not contain an express standard of review, the appropriate standard of review is whether the agency's actions are arbitrary and capricious, an abuse of discretion, or contrary to law. *See Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1989).

## V. REVIEW UNDER THE APA

The Supreme Court has declared the ESA to be "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978) ("Congress intended endangered species to be afforded the highest of priorities."). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. To accomplish this, the ESA includes substantive and procedural requirements that take "priority over the 'primary missions' of federal agencies." *Id.*

As discussed above, section 7 of the ESA establishes a consultation procedure to assist agencies in meeting this requirement whereby the expert wildlife agency issues a biological opinion on whether the agency action will cause jeopardy. 50 C.F.R. §§ 402.14(a), (b), and (g). If the wildlife agency determines that jeopardy will occur, it must provide a "reasonable and

11

1  prudent alternative" ("RPA") to the proposed action that will avoid jeopardy. *Id.* §§ 402.14(g),

2  (h). The RPA must be consistent with the intended purpose of the proposed action and be within

3  the action agency's authority. *Id.* § 402.03. If the agency cannot identify an RPA or if the action

4  agency is unwilling to implement it, the proposed action is prohibited without cabinet-level

5  authorization. 16 U.S.C. § 1536(e).

6          The RPA outlines one path that will avoid jeopardy and an agency may depart from the terms

7  of the RPA if it takes "alternative, reasonably adequate steps to insure the continued existence of any

8  endangered or threatened species." *Tribal Village of Akutan*, 869 F.2d at 1193; *Village of False Pass*

9  *v Watt*, 565 F. Supp. 2d 1123, 1154 (D. Alaska 1983) ("the decision whether or not to proceed with

10  the project rests ultimately with the Secretary. He must insure that agency actions are not likely to

11  jeopardize the continued existence of the species"). When an agency decides to depart from the terms

12  of the RPA, its decision must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in

13  accordance with the law." *Tribal Village of Akutan*, 869 F.2d at 1193.  Further, "[t]he biological

14  opinion is accorded substantial weight as evidence of the Secretary's compliance with the [ESA.]"

15  *Bennett v. Spear*, 520 U.S. 154, 169-70 (1997) ("A federal agency that chooses to deviate from the

16  recommendations contained in a biological opinion bears the burden of 'articulating in its

17  administrative record its reasons for disagreeing with the conclusions of a biological opinion'" (citing

18  51 Fed. Reg. 19,926, 19,956 (June 3, 1986)). Importantly, any decision to depart from an RPA must

19  be "well reasoned and supported by the record." *Tribal Village of Akutan*, 869 F.2d at 1194. The

20  agency need not, however, "justify [its] decisions by clear and convincing evidence." *Id.* at 1193.

21          In *Tribal Village of Akutan*, a case cited favorably by all parties, several Alaskan villages and

22  environmental organizations brought suit against the Secretary of the Interior to enjoin a multi-stage

23  oil and gas lease sale for the North Aleutian Basin. The plaintiffs argued, *inter alia*, that the Secretary

24  violated ESA section 7 when he deviated from the RPAs set forth in NMFS's biological opinion. In

the biological opinion, NMFS determined that a major oil spill during a peak migration period for gray whales would be likely to jeopardize the continued existence of the species. NMFS's RPA suggested creating a large offshore buffer zone to reduce the impact of an oil spill on gray whales. The Secretary did not fully adopt the proposal and instead opted to create a smaller offshore buffer zone as well as take additional mitigating actions.

The Ninth Circuit Court of Appeals held that the Secretary's decision to reject some of NMFS's RPA requirements was neither arbitrary nor capricious. The Court explained that the Secretary offered a well reasoned explanation for his decision to not provide the full offshore buffer zone suggested by the biological opinion. The Secretary supported his position by stating that "exploration-stage spills are most unlikely, that deletion of nearshore tracts would only marginally reduce the threat to endangered whales from such spills, and that seasonal or ad hoc drilling restrictions [could] provide adequate protection." *Id.* at 1194. The Court noted that the Secretary also adopted other mitigating measures, which included an agreement to consult informally with NMFS both during and after the lease-sale process, a modification of the Final Notice of Sale that informed lessees that drilling activities could be suspended during whale migration periods, and a requirement that operators and lessees post whale lookouts when conducting seismic tests. Further, the Court cited the district court's observation that the alternative action and mitigating measures adopted by the Secretary appeared to satisfy NMFS's parent agency, NOAA, "for in its final ESA comments on the sale NOAA did not reiterate those recommendations." *Id.* at 1194. In discussing that the Secretary had (1) implemented additional mitigation efforts, (2) demonstrated the improbability of a lease-sale stage oil spill, and (3) left an opening for further action down the road, the Court concluded that the Secretary had "fulfilled his responsibility to 'insure that agency action [was] not likely to jeopardize the continued existence of any endangered species." *Id.* at 1195 (quoting 16 U.S.C. § 1536(a)(2)).

1     NWF has the ultimate burden to show that FEMA's implementation of the RPA is

2  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5

3  U.S.C. § 706(2)(A). Under this standard, if FEMA has "considered the relevant factors and

4  articulated a rational connection between the facts found and the choices made[,]" then the Court

5  must uphold the agency's action. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir.

6  2004) (citation omitted). The Court is required to "make a careful and searching inquiry into the

7  facts" but it may not "substitute its judgment for that of the agency." *Center for Marine*

8  *Conservation v. Brown*, 917 F. Supp. 1128, 1143 (S.D. Texas 1996). An agency only violates the

9  APA if it has "relied on factors which Congress has not intended it to consider, entirely failed to

10  consider an important aspect of the problem, offered an explanation for its decision that runs

11  counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

12  difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*

13  *Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## VI. MOTION TO STRIKE

15     FEMA renews its motion to strike the Wald and Kirkpatrick declarations. It contends that

16  (1) the declarations are improper extra-record evidence under the APA, 5 U.S.C. § 706; (2) Ms.

17  Kirkpatrick's declarations are expert witness material submitted in violation of 18 U.S.C. § 207;

18  and (3) Plaintiff did not qualify Mr. Wald as an expert under Fed. R. Evid. 702.

19     The Court denied NWF's motion for preliminary injunction on April 12, 2012 (Dkt. #

20  69). Within the Order, and at issue here, the Court stated that it would permit review of extra-

21  record evidence because "the evidentiary restrictions under the APA do not apply and the Court

22  may consider evidence outside the administrative record," citing *Western Watersheds Project v.*

23  *Kraayenbrink*, 632 F.3d 472, 487 (9th Cir. 2010) for support. Dkt. # 69, p. 13.

1       The *Kraayenbrink* court expressly stated that "under *Washington Toxics Coalition* we

2  may consider evidence outside the administrative record for the limited purposes of reviewing

3  Plaintiff's ESA claim." *Kraayenbrink*, 632 F.3d at 497. In addition, in *Oregon Natural Desert*

4  *Ass'n v. Kimbell*, 593 F. Supp. 2d 1217 (D. Or. 2009), the district court upheld the Magistrate

5  Judge's decision to permit extra-record review and fleshed out its reasoning by discussing the

6  burden of proof necessary for plaintiff to prevail on its ESA claims. For example, the court noted

7  that under the plaintiff's ESA § 9 "taking" claim, plaintiff was required to prove by a

8  preponderance of the evidence that the Forest Service's actions resulted in an unlawful take of a

9  protected species, and that the take was reasonably certain to occur under the Forest Service's

10  contested program. *Id.* at 1220. The court noted further that the ESA claim could be

11  distinguished from a claim that challenges a specific administrative decision. *See id.* at 1220-21

12  ("Claims challenging the propriety of a consulting agency issuing a biological opinion are

13  governed by the APA. Claims arising directly under the ESA Citizen Suit Provision . . . , on the

14  other hand, based upon events occurring in the aftermath of agency decisions, are not limited by

15  the APA scope of review.") (citations omitted). Because this case concerns FEMA's revised and

16  ongoing implementation of the NFIP in the wake of the 2008 BiOp, extra-record evidence may

17  be admissible. Thus, the Wald and Kirkpatrick declarations will not be stricken on that basis.

18       However, the Court finds that the Wald and Kirkpatrick declarations are simply not

19  relevant. Federal Rule of Evidence 702 provides:

20        If scientific, technical, or other specialized knowledge will assist the trier
           of fact to understand the evidence or to determine a fact in issue, a witness

21        qualified as an expert by knowledge, skill, experience, training, or
           education, may testify thereto if (1) the testimony is based upon sufficient

22        facts or data, (2) the testimony is the product of reliable principles and
           methods, and (3) the witness has applied the principles and methods

23        reliably to the facts of the case.

24

15

The trial court must act as a "gatekeeper" to ensure that proffered expert testimony is both relevant and reliable. *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Relevance means that the evidence will assist the trier of fact to understand or determine a fact in issue. *Cooper v. Brown,* 510 F.3d 870, 942 (9th Cir. 2007); *see* Fed. R. Evid. 702. Where expert testimony is based on "technical" or "other specialized knowledge" rather than science, the Court must ensure that it "rests on a reliable foundation and is relevant to the task at hand." *United States v. Hermanek,* 289 F.3d 1076, 1093 (9th Cir. 2002) (quoting *Daubert,* 509 U.S. at 597). The gatekeeping function serves to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152.

Ms. Kirkpatrick's declarations contain her opinions about whether FEMA's implementation of the NFIP complied with the RPA during her tenure at the NMFS, which ended prior to the start of this litigation. As explained below, the Court must measure FEMA's compliance with the RPA against the language contained in the RPA. Ms. Kirkpatrick's declarations do not inform this process because the record speaks for itself. NMFS is not a party to this suit, and Ms. Kirkpatrick's opinions are not formal statements concerning NMFS's approval or disapproval of FEMA's implementation of the NFIP.

Mr. Wald's declarations are primarily directed to assessing individual community compliance with the developments standards contained within the RPA.  Thus, Mr. Wald's declarations do not assist the Court in measuring FEMA's administration of the NFIP against the plain terms of the RPA. Accordingly, the Court will grant the motion to strike.

# VII. ANALYSIS

## A. The Contested RPA Elements (2, 3, 5, 6, and 7)

The parties devoted the majority of their briefing and argument to the substantive requirements of RPA Element 3. Thus, the Court begins its analysis there.

### 1. RPA Element 3: NFIP Minimum Criteria

Element 3 directed FEMA to "modify its implementation of the NFIP minimum criteria in NFIP communities in the Puget Sound Region in order to prevent and/or minimize the degradation of channel and floodplain habitat." BiOp at 153. The BiOp identified two types of areas within the SFHA floodplain: the Protected Area, and the remainder of the floodplain. Different development standards apply to each area. The Protected Area consists of the outermost boundary within the SFHA of either (1) the floodway, (2) the Channel Migration Zone ("CMZ") plus 50 feet, or the Riparian Buffer Zone ("RBZ") as described by Washington State regulations. BiOp 2d Errata (Dkt. # 11-1, p. 245).  RPA 3.A created the development standard for each area. NWF takes issue with the how FEMA has revised its NFIP eligibility process to comply with RPA 3.A. NWF contends that FEMA's "3 Door" compliance pathway does not avoid jeopardy because no door option incorporates all of the RPA's standards and directives. NWF considers Door 3 compliance option the most problematic.

RPA Element 3.A directs FEMA to revise its implementation of its minimum criteria compliance standards such that community eligibility requires either (1) no development within the Protected Area, **or** (2) that local permitting authorities demonstrate "no adverse effects" of proposed development within the Protected Area. This means that NFIP communities must "demonstrate to FEMA that any proposed development in the [Protected Area] does not adversely affect water quality, water quantity, flood volumes, flood velocities, spawning

17

1   substrate, and/or floodplain refugia for listed salmonids." BiOp at 154. In addition, there must be

2   either (1) no development in the 100 year floodplain, **or** (2) for permitted development within the

3   floodplain, the adoption of certain mitigation measures and use of Low Impact Development

4   methods. *See id.*

5   a.      *Overview of FEMA's 3 Door Compliance Pathway*

6          FEMA argues that it does not have land use authority and cannot prohibit floodplain

7   development. Thus, it cannot implement the BiOp's "no development" directives. To comply

8   with the BiOp's alternative directives, it has created the 3 Door compliance pathway that allows

9   NFIP communities to demonstrate compliance with Element 3.A. This compliance program was

10  created in collaboration with a focus group that included NMFS staff and the NFIP communities.

11  Dkt. # 86, Carey SJ Decl., ¶ 76.

12         Door 1 requires a community to adopt FEMA's Model Ordinance, which FEMA

13  contends incorporates all of the performance standards required by Element 3.A and Appendix 4

14  of the BiOp. *See* Dkt. # 17, Carey PI Decl., ¶ 67.  If a community chooses this option, it must

15  enact the Model Ordinance through its own lawmaking process.

16         Because some communities reported that they already had state-mandated ordinances and

17  programs that complied with Element 3.A, FEMA developed a Compliance Checklist for these

18  communities to show FEMA the location of each of the performance standards within their local

19  regulations. *Id.* at ¶ 74. This is referred to as Door 2 compliance.

20         Door 3 compliance allows a community to demonstrate compliance with Element 3.A on

21  a permit-by-permit basis. *Id.* at ¶ 69. This pathway requires development permit applicants to

22  submit a habitat assessment to their local permitting authority. *Id.* at ¶¶ 80-81. Unless the

23  applicant demonstrates "no adverse effects" of the project, the applicant must either abandon or

24

18

redesign the project, or undergo an ESA consultation with NMFS before a permit may be granted. *Id.*

For Door 1 and 2 communities, FEMA has requested that NMFS review the communities' compliance submissions to ensure that they satisfy Element 3.A's directives.  Dkt. # 86, Carey SJ Decl., ¶ 156.

b.    *FEMA's implementation of RPA Element 3*

RPA Element 3.B states in relevant part that "the FEMA shall implement Element 3.A by ensuring that all participating NFIP communities in the Puget Sound Region implement land-use management measures consistent with the criteria . . . ." BiOp at 155. The "Minimum Criteria" are found in Appendix 4 in the BiOp. *Id.* at 221-26.  Plaintiff contends that each of FEMA's 3 Doors for community compliance fail to incorporate Appendix 4's development standards and directives. Primarily concerned with the permit-by-permit approach to Door 3 compliance, Plaintiff argues that FEMA's lack of oversight over individual development permits allows NFIP communities to avoid the proscriptive measures of the RPA. FEMA contends that its 3 Door compliance pathway satisfies Element 3 because (1) the BiOp does not require it to police the permit counter of each NFIP community, (2) even if there are problems with the individual communities' compliance, FEMA's implementation of the compliance pathways, the guidance it offers, and the monitoring of community compliance it conducts satisfies the RPA, and (3) NMFS has formally stated that FEMA's current approach is consistent with the intent of RPA Element 3. The Court agrees with FEMA that the measures it has taken are consistent with the language of the BiOp.

To demonstrate that FEMA's implementation of the NFIP fails to satisfy Element 3, Plaintiff focuses on actions taken by the communities in approving floodplain development

1   permits. Plaintiff points to numerous instances where it believes that individual communities

2   have failed to implement the Minimum Criteria. *See, e.g.*, Dkt. # 75, Auburn City Code,

3   15.68.160(B) (Hasselman SJ Decl., Ex. 23); *id.*, Roy City Code, 31-1-5(1)(C) (Hasselman SJ

4   Decl., Ex. 22).  But as FEMA notes, it is not a land-use authority and it can only provide

5   guidance, technical assistance, require reporting, and institute enforcement actions, which is

6   what is required of it under the RPA. FEMA believes that is has done, and continues to do, what

7   it can with the authority it has.

8          The BiOp states that it is the local jurisdiction with permitting authority that must

9   demonstrate to FEMA that any proposed development will not adversely affect protected habitat.

10   *See* BiOp at 154. Further, the BiOp contemplated that RPA compliance would require protracted

11   interactions between FEMA, the NFIP communities, and NMFS. For example, Element 3.D

12   recognized that jurisdictions may grant development permits that allowed development without

13   considering the Minimum Criteria or appropriate mitigation. *See* BiOp at 157. In such instances,

14   the BiOp required FEMA to flag and report the information to NMFS. *Id.* Then, "[i]f NMFS

15   finds that any unmitigated actions affecting listed species have occurred as a result of these

16   permits, FEMA will ensure mitigation for these actions . . . ." *Id.* Throughout the RPA, the BiOp

17   mandates ongoing communication between the NFIP jurisdictions, FEMA, and NMFS to ensure

18   that *the communities* adopt floodplain management measures that are consistent with the

19   Minimum Criteria. *See, e.g.*, *id.* at 157 ("The FEMA must report to NMFS on their [sic] progress

20   . . . [a]lso, communities will provide information to FEMA on a semi-annual basis").

21          Importantly, the RPA does not identify a specific compliance program for FEMA to

22   implement. It is silent on how FEMA should ensure that communities meet the "no adverse

23   effects" standard for all development going forward. Further, although the BiOp recognizes that

24                                                    20

1    there are vastly different floodplain development considerations among the 122 Puget Sound

2    communities, it fails to provide any tailored recommendations or compliance approaches for

3    those individual communities. Indeed, NMFS recognized this to be true. *See* AR 16435, Stelle

4    Sept. 26, 2011 Letter ("The RPA was written as a programmatic consultation that applies to the

5    entire geographic region, and the applicability of each element of the RPA may vary from place

6    to place since differing jurisdictions have differing floodplain conditions and requirements . . .

7    some components of the RPA may not apply to every jurisdiction, because in some jurisdictions

8    the floodplain no longer contains essential habitat features. NMFS believes it is contingent on

9    local governments to determine which functions are present in the floodplain, and how they will

10   maintain and restore floodplain functions."). Consistent with the letter of the BiOp, NMFS also

11   believed that communities are responsible for identifying how they can best comply with the

12   general standards outlined in the RPA.

13          Ultimately, the BiOp lacks any specific Element 3 implementation guidance for FEMA.

14   The Court agrees with Plaintiff "that without clear and objective standards for adverse effects,

15   project proponents can easily prepare 'assessments' finding no adverse impact." Dkt. # 74, p. 32.

16   However, it was the BiOp, not FEMA, that created the undefined "no adverse effects"

17   enforcement obligation. *See, e.g.*, BiOp at 154 (introducing adverse effects language without

18   explaining or defining term). The record shows that FEMA and the communities sought

19   extensive assistance from NMFS to clarify the BiOp's ambiguous compliance standard. See, e.g.,

20   Dkt. # 34-2, p. 2 ("[NMFS] recognize[s] there is a lack of clarity amongst local jurisdictions

21   regarding expected implementation efforts").

22          To date, FEMA has issued several guidance documents to help communities understand

23   their compliance obligations under the RPA. These documents include the Door 1 "Model

24                                                  21

Ordinance" (AR 16524), the Door 2 "checklist" (AR 16610), the "Habitat Assessment

Guidance" document (AR 2950), and the "FAQ" memoranda (AR 3220-3250).      Contrary to

Plaintiff's argument that FEMA's permit-by-permit approach requires only "an 'assessment' of

unspecified content to meet an undefined standard," FEMA's guidance documents give meaning

and depth to the undefined standard set out in the BiOp. For example, with respect to Door 3

compliance, FEMA issued the "What does it mean to be in 'Door 3'" FAQ document. AR 3241-

43. Therein, FEMA explained to Door 3 communities that

> [i]n order to avoid allowing incremental, systemic loss of essential
> ecosystem features to occur, the compliance standard for Door 3 must be a
> high showing that individual projects seeking development in the
> floodplain will retain the full level of baseline function. The impact of the
> project on habitat may be difficult to evaluate because there is often little
> or no information on the baseline conditions of the site's natural features
> and habitat functions. The scope, magnitude, and risks associated with
> possible impacts to populations or their habitats vary greatly by project. A
> habitat assessment is needed to identify those natural processes and habitat
> functions that currently exist (i.e. the environmental baseline) and
> determine how the proposed project will affect them.

AR 3241-42. The FAQ document directs communities to the FEMA Region X Guidance for

conducting habitat assessments, and that guidance document provides detailed information for

communities about how to demonstrate ESA compliance for proposed development projects.

Because the BiOp failed to identify meaningful and community-tailored compliance options,

FEMA was tasked with creating a comprehensive compliance program. It then had to take into

account the disparate resources, technical expertise, and baseline environmental conditions of the

Puget Sound communities to craft a workable program.

Consistent with its enforcement obligation, FEMA has initiated enforcement actions

against communities that were late in submitting annual reports and against communities that

failed to demonstrate RPA compliance before issuing floodplain development permits. For the

1  48 communities that had not, as of February 2012, complied with FEMA's annual reporting

2  requirement, FEMA required them to submit reports and conducted in-person visits. Dkt. # 86,

3  Carey SJ Decl., ¶¶ 221-23. Further, FEMA initiated enforcement actions in four communities

4  after it learned that development projects were allowed to proceed without the required adverse

5  effects analysis. *Id.* at ¶¶ 224-242. For those projects, FEMA sought documentation, explanation,

6  local building code enforcement action, or changes to local permitting procedures. *Id.* FEMA

7  conducted on-site and in-person enforcement visits with NMFS personnel, and it maintains that

8  the unauthorized projects are either undergoing ESA § 7 consultation, or that the problematic

9  structures have been removed, or that local building code enforcement actions are pending. *See*

10  *id.*

11         Plaintiff relies on *Florida Key Deer v. Brown*, 364 F. Supp. 2d 1345 (S.D. Fla. 2005)

12  *aff'd sub nom. Florida Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008), to support its

13  contention that FEMA's permit-by-permit approach is unlawful because it relies on the

14  communities' voluntary participation, subject only to FEMA's enforcement and oversight, which

15  does not protect against cumulative habitat loss. In *Florida Key Deer*, the court found that both

16  FWS and FEMA abused their discretion by adopting and implementing an arbitrary and

17  capricious RPA that failed to protect threatened species against jeopardy. The court considered

18  the RPA deficient for two reasons. First, the Court determined that the RPA proscribed a

19  voluntary approach that did "nothing to ensure that either the county or the landowners w[ould]

20  comply with the RPA's procedures." *Id.* at 1356.  Second, it determined that by allowing

21  development to proceed on a project-by-project basis, the RPA unlawfully failed to consider the

22  cumulative effects to habitat loss. *Id.* at 1357.

23

24                                              23

NWF raises the same challenges here, but *Florida Key Deer* can be distinguished on both points.  As to voluntary participation, FEMA has not made community compliance voluntary. FEMA requires NFIP communities to choose a compliance pathway to remain NFIP eligible. It then offers those communities guidance on how they may satisfy their ESA compliance obligations under each of the compliance options. That not all of Appendix 4's directives and FEMA's guidance may be applicable to an individual community does not make FEMA's compliance program "optional." In *Florida Key Deer*, the RPA allowed for FWS to review development projects at its discretion, and it did not compel landowners to comply with FWS's recommendation, should FWS choose to review a project. Here, the record demonstrates that FEMA required each community to choose a compliance pathway, and that it initiated enforcement actions when communities failed to comply.

Plaintiff's cumulative effects challenge relies on the baseline assumption that project-by-project review can never account for cumulative adverse effects to critical habitat. Critically, the BiOp does not prohibit FEMA from allowing permit-by-permit review so long as a cumulative effects analysis takes place during the permitting review process. Although it makes sense that assessing the cumulative impact of development projects during the review process for an individual project will be more difficult, the BiOp does not prohibit such an approach and FEMA has recognized that permit-by-permit review is not without limitations. *See* AR 3239. Moreover, the record here contains no quantifiable evidence of cumulative adverse effects to critical habitat.

The record before the *Florida Key Deer* court was different. There, the RPA allowed for permit-by-permit review of proposed development projects. The record showed that of the 2,022 projects allowed to go forward, 101 of the projects were for fences in critical habitat areas where the threatened Key Deer's survival was at risk "*due to fencing*[.]" *Florida Key Deer*, 364 F.

1    Supp. 2d at 1357. On that record, the court easily concluded that FWS's "piecemeal review is

2    inconsistent with conclusions of FWS that habitat loss and fragmentation 'taken together' cause

3    jeopardy to the Listed Species." *Id.*

4            Finally, FEMA contends that the Court should consider NMFS's formal statement that

5    NMFS believes FEMA has complied "with the intent of Element 3" as record evidence

6    demonstrating FEMA's substantive compliance. This statement is found in NMFS Regional

7    Administrator William Stelle, Jr.'s letter to FEMA, dated February 3, 2012. The letter is

8    produced in relevant part as follows:

9            NMFS believes that the measures FEMA has implemented are consistent
             with the intent of Elements 3 and 5. Your annual report for 2011 provides
10           new information for NMFS regarding FEMA's compliance with other
             elements of the RPA. NMFS will provide a review of the report in a
11           separate transmittal, but we are encouraged by the additional information
             provided this year and the work that is reported as completed.
12           . . .
             Element 3 requires significant changes to a complex program involving
13           numerous local jurisdictions, state and local regulations and coordination
             between regional and national components of a Federal agency. There has
14           also been uncertainty about how to implement the RPA in highly
             developed watersheds. Landscapes in Western Washington range from
15           undeveloped, nearly pristine habitats that maintain ecosystem functions to
             fully developed landscapes with fair to poor quality habitat that will not
16           benefit from revised NFIP management under the RPA. *For judging the
             sufficiency of the protective measures applied to these differing habitats it
17           is necessary to recognize the habitat functions that still exist. We
             recognize there is a lack of clarity amongst the local jurisdictions
18           regarding expected implementation efforts needed for these different
             habitats, and that the lack of clarity created difficulties for FEMA and
19           those local jurisdictions.* While NMFS does not expect heavily developed
             floodplains to be restored to provide the natural ecosystem functions that
20           occur in undeveloped areas, it is our expectation that existing habitat
             functions will be maintained and enhanced over time as part of the proper
21           and full execution of the RPA. Clarifying the differences among local
             jurisdictions based upon existing habitat functions underscores the
22           importance of – and our appreciation for – maintaining the close
             relationship with FEMA as the NFIP is implemented over time in a
23           manner that is consistent with the recovery of listed salmonids.

24                                                    25

1

2   Dkt. # 34-2, p. 2 (emphasis added). The cautious language used by NMFS, indicating that

3   FEMA's compliance program satisfies the intent of Element 3, is not dispositive of whether

4   FEMA has in fact complied with Element 3. The letter is not a formal determination by NMFS

5   that the agency action complied with the RPA in full. The letter, however, is meaningful in a

6   different way, as it lends support to the Court's construction of the scope of the RPA. The letter

7   demonstrates that NMFS was aware that the RPA did not account for different baseline

8   environmental conditions across the NFIP communities, and that the RPA failed to provide clear

9   guidance for communities to implement relevant standards and directives. At heart, Plaintiff

10  relies on evidence of an individual community's confusion over what RPA standards it must

11  consider before issuing a development permit, or an individual community's failure to provide

12  the required habitat assessment, to prove that FEMA has failed to implement Element 3. That

13  factual evidence, which is contested by both FEMA and the Defendant intervenors, does not

14  demonstrate that FEMA's compliance program fails to satisfy the RPA. Instead, the evidence

15  offers a running commentary about Element 3's lack of clarity, and it shows that the

16  development standards were not tailored to help communities understand their NFIP and ESA

17  compliance obligations.

18          The Court recognizes that the question of whether individual communities have met their

19  compliance obligations through FEMA's oversight is both important and controversial. It also

20  recognizes that FEMA's compliance program has been modified throughout this litigation to

21  better meet NMFS's expectations, and to respond to allegations of perceived community non-

22  compliance that Plaintiff identified through discovery. *See, e.g.*, Dkt. # 88, Riebau Decl., ¶ 48

23  (stating in response to Hassleman Decl at ¶ 24's allegation that Skagit County issued permits

24

without requiring habitat assessments, "I have contacted Skagit County and requested a full explanation of what [the identified development permits] are for, confirmation that they involved land-disturbing activities, and a description of the steps taken to ensure that issuing the permits, either individually or cumulatively, caused no adverse effect to salmon habitat"). However, the Court's role under the APA standard, where no party has brought suit against NMFS and the BiOp, is to measure FEMA's compliance against the language of BiOp. By not defining a comprehensive compliance scheme, the BiOp gave discretion to FEMA to fashion a workable program. Having fully considered the scope of FEMA's 3 Door compliance program, its guidance documentation, and its enforcement procedures, the Court finds that NWF has failed to meet its burden to show that under Element 3, FEMA's implementation of the 3 Door compliance program was an abuse of discretion, arbitrary or capricious, or not in accordance with the law.

2.   RPA Element 2: Mapping

     In its motion, NWF identifies two primary concerns with FEMA's compliance with RPA Element 2. First, NWF contends that FEMA's procedure for processing Letters of Map Revision encourages communities to add fill to existing floodplain to map those areas out of the designated floodplain. Second, NWF argues that FEMA has failed to timely update its maps for accuracy and to account for future climate change.

a.   *Sub-Element 2.A*

     Sub-Element 2.A states in pertinent part as follows:

     The FEMA shall process Letters of Map Change caused by manmade
     alterations only when the proponent has factored in the effects of the
     alterations on channel and floodplain habitat function for listed salmon,
     and has demonstrated that the alteration avoids habitat functional changes,
     or that the proponent has mitigated for the habitat functional changes

resulting from the alteration with appropriate habitat measures that benefit affected salmonid populations. The FEMA will ensure that effects from habitat alterations that are reasonably certain to occur but might occur later in time, such as changes in storm water quantity, quality, and treatment, decreased riparian vegetation, lost large woody debris, increased bank armoring, and impaired channel migration, are also mitigated. The FEMA will report to NMFS on the results of mitigation for manmade floodplain changes that become the basis for map revision requests.

BiOp at 152.

FEMA periodically revises its FIRMs by making corrections through Letters of Map Revisions ("LOMRs") or Letters of Map Amendments ("LOMAs"), collectively referred to as LOMCs. Dkt. # 17, Carey Decl., ¶ 29 (citing 42 U.S.C. § 4104(f), (h) and 44 C.F.R. Parts 70, 72). A LOMR is used to modify a FIRM where "physical measures that affect the hydrologic or hydraulic characteristics of a flooding source" are implemented, which "result in the modification of the existing regulatory floodway, the effective base flood elevation, or the SFHA." 44 C.F.R. § 72.2. Importantly, FEMA grants LOMR requests for projects that have already been implemented. It "does not authorize, permit, fund, license, zone or otherwise approve construction of any projects in the floodway" for which LOMRs are requested. Dkt. # 17, Carey PI Decl., ¶ 30.

FEMA may issue LOMRs for projects that involve using fill to modify the SFHA. These are referred to as "LOMR-Fs." *Id.* at 31. "The LOMR-F documents the fact that the property is no longer subject to the 1% annual chance of flooding due to the risk reduction measures taken so the property is now outside the SFHA." *Id.* The BiOp determined that the practice of using fill to remove property from the SFHA posed a risk to salmon recovery efforts in certain regional locations. *See* BiOp at 133 ("[t]he NFIP requirements that fill be placed to the BFE in order to

elevate buildings, [and] that fill above the BFE is a foundation for being removed from the

mapped floodplain, . . . create habitat and adjacent watershed conditions in opposition to

[salmon] recovery projects and elements"). It also stated that "[p]lacing fill to elevate properties .

. . . [is] detrimental to floodplain and channel function." *Id.* at 85. The BiOp recognized that

FEMA's endorsement of using fill to map an area out of the floodplain, and thus out of the

NFIP's insurance requirements, created an incentive for "individuals to remove their property

from regulation by artificially filling it." *Id.* at 84. NWF contends that because FEMA continues

to process LOMRs and LOMR-Fs without independently assessing whether the project will

adversely affect critical habitat, the incentive to remove property from the floodplain remains.

There are two pathways for property owners to obtain a LOMR that is approved by

FEMA. Property owners may either (1) apply for a LOMR from FEMA for a project that has

already been completed, or (2) seek a Conditional Letter of Map Revision from FEMA

("CLOMR" and "CLOMR-Fs"), which requires that the property owner demonstrate ESA

compliance prior to obtaining FEMA's approval. FEMA implemented Procedure Memorandum

64 (AR 2310-2316) to comply with the RPA for the CLOMR process. CLOMRs are requested

for a project before any floodplain modification occurs. FEMA now mandates that

> [t]he CLOMR-F or CLOMR request will be processed by FEMA only
> after FEMA receives documentation from the requestor that demonstrates
> compliance with the ESA. The request must demonstrate ESA compliance
> by submitting to FEMA either an Incidental take Permit, Incidental Take
> Statement, "not likely to adversely affect" determination from [NMFS and
> FWS] or an official letter from [NMFS and FWS] concurring that the
> project has "No Effect" on listed species or critical habitat. If the project is
> likely to cause jeopardy to listed species or adverse modification of critical
> habitat, then FEMA shall deny the conditional LOMC request.

AR 2310-2316.

1    NWF challenges FEMA's approval of LOMRs because, unlike the CLOMR process, the

2  LOMR process does not require FEMA to independently evaluate ESA compliance and act in

3  consultation with NMFS. Thus, NWF believes that the LOMR process allows property owners to

4  pursue floodplain alterations without demonstrating ESA compliance. NWF wants FEMA to

5  either "require analysis before the fact, or [require] adequate mitigation later." Dkt. # 74, p. 20.

6  Because FEMA only "reminds" communities about their obligations to comply with the ESA

7  when processing LOMRs, NWF contends that the LOMR process encourages the "cumulative

8  degradation of habitat and the critical point of RPA #2." *Id.* at p. 21.

9    FEMA contends that the LOMR process adequately protects against habitat degradation

10 because the permitting process ensures that only RPA Element 3-compliant projects will obtain

11 development permits. FEMA believes that the permitting process offers an independent route for

12 RPA compliance such that it does not have to alter how it approves LOMRs because if a

13 community has obtained an ESA-compliant permit, there is no need for FEMA to re-assess ESA

14 compliance before granting the LOMR. Because FEMA believes that it is in compliance with

15 RPA Element 3, it believes that it has complied with RPA Element 2.A.

16    As discussed above, FEMA's implementation of the 3 Door approach to satisfy RPA

17 Element 3 was not arbitrary and capricious. The language of Element 2.A places the burden of

18 demonstrating that the proposed floodplain alteration avoids functional alterations squarely on

19 the proponent requesting the LOMR. Under its 3 Door approach, FEMA requires that all

20 proposed land development permits that affect the floodplain meet the "no adverse effects" test.

21 In that sense, and contrary to NWF's assertions, FEMA's process requires "before-the-fact"

22 assessment of adverse affects, and allows for NMFS to identify potential mitigation actions.

23 FEMA has shown that it considered the issues identified by the BiOp related to LOMCs,

24

changed its procedures with respect to the CLOMR process, and changed its permit reporting

and compliance procedures to capture floodplain alteration projects for which CLOMRs would

be requested. NWF has therefore failed demonstrated that FEMA's approach to Element 2.A was

arbitrary and capricious.

b.    *Sub-Element 2.C*

Sub-Element 2.C concerns updating floodplain modeling to generate accurate floodplain

maps and states as follows:

> The FEMA shall ensure that floodplain modeling incorporates on-the-
> ground data to increase the accuracy of maps depicting the floodplain. For
> multi-thread channels, FEMA shall produce and distribute a Technical
> Bulletin recommending the use of unsteady state hydraulic models to map
> the boundaries of the 100-year floodplain. In addition, FEMA will use a 2-
> dimensional model in estuarine floodplains and in other areas where
> applicable.
>
> The FEMA will also revise map modeling methods to consider future
> conditions and the cumulative effects from future land-use change, to the
> degree that such information is available (e.g. zoning, urban growth plans,
> USGS Climate study information[]). Future conditions considered should
> include changes in the watershed, its floodplain, and its hydrology; climate
> change, and other conditions that affect future flood risk. The FEMA shall
> ensure that jurisdictions use anticipated future land use changes when
> conducting hydrologic and hydraulic calculations to determine flood
> elevations.

BiOp at 152. NWF contends that FEMA has improperly delegated its obligation to update its

maps on the individual communities. It believes that FEMA has merely advised communities

about updating maps for informational purposes and has failed to offer useful guidance on

mapping for future climate change. Although FEMA has been conducting a draft national study

on the impact of climate change on floodplain habitat, the draft was only very recently

completed. NWF states that "[i]n sum, FEMA has vacillated between claiming it lacks authority

1   to consider future conditions, and arguing that RPA #2 doesn't require it to do anything to

2   address map accuracy at all." Dkt. # 74, p. 23.

3         FEMA believes that it is in compliance. Element 2.C requires FEMA to (1) ensure that

4   floodplain modeling incorporates on-the-ground data and issue a Technical Bulletin, (2) revise

5   its modeling methods to consider future conditions and cumulative effects of land-use change,

6   and (4) ensure that jurisdictions use anticipated future land-use changes when calculating flood

7   elevations.

8         FEMA contends that its FIRMs cannot currently be updated to include future conditions

9   because the FIRMs must actuarially reflect the current risk of flooding in NFIP communities. 42

10  U.S.C. § 1401; see also 44 C.F.R. § 65.6(a)(3) ("revisions . . . cannot be made based on the

11  effects of proposed projects or future conditions"). FEMA also believes that passage of the

12  Biggert-Waters Flood Insurance Reform Act of 2012 overrides the entire process by which it

13  would analyze and adopt map revisions. *See* Dkt. # 112, Carey SJ Reply Decl., ¶ 44. The Act

14  required creation of a Technical Mapping Advisory Council to address NFIP mapping reform.

15  *Id.* The advisory council is required to recommend

16      (1) procedures to cost-effectively improve accuracy, general quality,
        performance metrics, and other aspects of preparing Flood Insurance Rate

17      Maps (FIRMs); (2) mapping standards and guidelines for FIRMs; (3) map
        maintenance; (4) delegation of mapping activities to State and local

18      mapping partners; (5) improving interagency and intergovernmental
        coordination and leveraging; and (6) submitting an annual report to the

19      FEMA administrator that contains a description of annual activities, and
        evaluation of the status and performance of FIRMs and mapping activities

20      to revise and update FIRMs, and a summary of recommendations.

21

22  *Id.* at ¶ 45. The advisory council must also "consult with scientists and technical experts, other

23  Federal agencies, States, and local officials to develop recommendations regarding consideration

24

of future conditions" and it is required "to prepare a separate report . . . that will contain

recommendations regarding the treatment of future conditions within the context of the NFIP."

*Id.* at ¶ 46. Plaintiff has failed to show that FEMA's reliance on the provisions of the Biggert-

Waters Act, which governs the revision of NFIP FIRMs and includes the future conditions

assessment required by the BiOp, is unreasonable or arbitrary and capricious.

*c. Sub-Element 2.D*

Sub-Element 2.D requires FEMA to "encourage communities to evaluate and identify the

risk of flooding behind 100 year levees based on anticipated future conditions and the cumulative

effects from future land-use change." BiOp at 152. FEMA believes that it has complied with this

sub-element in full. In April, 2009, FEMA published a fact sheet to inform property owners of

the residual risk associated with living behind levees. *See* Fact Sheet: Living Behind Levees, AR

2204-2205. This Fact Sheet provides information about levee systems for homeowners, business

owners, and other citizens who live and work on levee-impacted areas. Additionally, FEMA

participated in developing the National Committee on Levee Safety's report to Congress

recommending that a National Levee Safety Commission be established. *See* Report by National

Committee on Levee Safety, AR 2208-2309; *see also*

http://www.leveesafety.org/ip_FinalProgress_on_Recommendations_21July11.cfm. FEMA also

states that future-conditions flood hazard information will be provided at the community's

request for the community's use in regulating floodplain development. *See* 44 C.F.R. § 64.3.

[Dkt. # 17, Carey PI Decl. at ¶ 64]. Plaintiff has not shown that FEMA's guidance to

communities on this sub-element fails to satisfy Element 2.

3.    RPA Element 5: Levee Vegetation and Construction

RPA Element 5 addresses the relationship between FEMA's program and the

1    maintenance of levees and certain kinds of other construction. Sub-Element 5.A requires FEMA

2    to "*not* recognize levees certified by the Army Corps of Engineers under its levee vegetation

3    certification standards *unless* it has been demonstrated that the vegetation standard will not

4    adversely affect species or their habitat." BiOp at 160.  Sub-Element 5.B requires FEMA to

5    revise its procedure memoranda to reflect that levee owners who have been disqualified from

6    Corps repair funding (for failure to abide by the Corps' vegetation standards) will remain eligible

7    for FEMA emergency funding if the levee is certified by a professional engineer. *Id.*  Sub-

8    Element 5.D requires that FEMA recognize new levees and floodwalls only when certain criteria

9    are met. *Id.* at 161. NWF contends that FEMA has improperly refused to implement 5.A, B, and

10   D by stating that implementation is beyond its authority.

11          FEMA states that it "does not design, construct, fund, or approve levee systems or

12   floodwall systems. Rather, FEMA's role is to determine if the levee owner has submitted proof

13   to show that a levee provides protection from the one-percent-annual-chance flood." Dkt. # 31, p.

14   48 (citing 44 C.F.R. § 65.10). For 5.A FEMA contends that it lacks authority to decline to

15   recognize Corps-certified levees under 44 C.F.R. § 65.10(e). It also states that it has not

16   recognized a Corps' certified levee since the BiOp was issued. *See* Dkt. # 86, Carey SJ Decl., ¶

17   190.  For 5.B, FEMA contends that emergency funding issues are types of assistance provided

18   under a different program than the NFIP and therefore 5.B should not have been included in the

19   RPA, Moreover, it contends that it lacks statutory authority to provide disaster assistance to any

20   entity that is eligible for assistance under another federal program. This means that if a person is

21   eligible for, but denied Corps's emergency funding, FEMA may not provide emergency funding

22   as per 42 U.S.C. § 5155(c). Further, FEMA states that it is not aware of any levee owners who

23   were denied flood damage repair funding on this basis. *See* Dkt. # 86, Carey SJ Decl., ¶ 193. For

24                                                      34

5.D, FEMA argues that any levee construction or development is subsumed under Element 3's permitting process.

In its February 3, 2012 letter to FEMA, NMFS commented as follow:

> Your January 25th letter explains that FEMA is unable to implement
> certain portions of Element 5 of the RPA because its substance is outside
> FEMA's authority. NMFS believes the conditions specified in Element 5
> are essential to recovery of listed salmonid species in western Washington,
> and understands that these issues continue to be contentious both locally
> and nationally. However, NMFS believes that there are better venues
> among federal agencies to address implementation of the standards
> contained in this Element and is actively engaged with FEMA and the
> Corps of Engineers in those efforts. . . . We are also pleased that FEMA is
> providing guidance to local jurisdictions with "Levee Vegetation and
> Mapping" and Procedural Memoranda 63 and 64. It is NMFS
> understanding, that Region X will require new levees to be evaluated with
> a Conditional Letter of Map Revision (CLOMR) process that includes a
> Section 7 consultation.

Supp. A.R. at 8. Considering NMFS's statement that "there are better venues among federal agencies to address implementation of the standards contained in [Element 5]" with FEMA's interpretation of its statutory authority, the Court cannot say that FEMA's implementation of Element 5 was an abuse of discretion or arbitrary and capricious.

4.      RPA Element 6: Floodplain Mitigation Activities

Element 6 states in relevant part as follows:

> For any development actions in floodplains proceeding consistent with
> current NFIP requirements, that occur during the period prior to full
> implementation of RPA elements 2, 3, and5 [sic], and that degrade
> channel or floodplain habitat in NFIP communities (including from the
> indirect effects of development in the floodplain), and for any
> development for which FEMA, in coordination with NMFS pursuant to
> RPA 3 finds that additional mitigation is necessary, FEMA shall ensure
> that appropriate mitigation occurs. For example, FEMA may assist in
> floodplain mitigation/restoration activities as identified in the PS recovery
> plan, via contribution of financial, technical, or physical (labor or
> equipment) support.

35

1    BiOp at 161. NWF contends that all FEMA has done to discharge its obligation under Element 6

2    is provide guidance and technical advice to communities that is untethered from a specific

3    mitigation effort. It contends that there have been no mitigation or restoration activities to offset

4    the harm of floodplain development activities that have occurred since the BiOp was issued.

5        FEMA contends that by providing technical assistance to communities, it has satisfied

6    Element 6 by its plain terms. FEMA also points out that the reporting process that was

7    implemented under Element 3 is the primary vehicle for identifying permitted projects that

8    require mitigation. FEMA reports to NMFS annually for a determination about whether

9    mitigation efforts may be necessary for any particular project. FEMA notes that NWF has failed

10   to identify a single instance where NMFS required a specific mitigation plan for a project that it

11   was asked by FEMA to review.

12       FEMA provided technical assistance to communities in the form of training, public

13   outreach, preparing guidance documents, community consultations, a dedicated website,

14   organizing conferences and workshops, and participating in an intergovernmental salmon

15   coalition. Dkt. # 17, Carey PI Decl, ¶¶ 157-171. It procured funding to acquire 25 flood-prone

16   properties for conversion to open space. *Id.* at ¶¶ 144-49. And in 2012, FEMA conducted 26

17   community assistance visits ("CAVs") to help communities understand their obligations under

18   the BiOp. *Id.* at ¶ 206. NMFS staff attended 21 of the 26 meetings. *Id.* While Plaintiff contends

19   that such measures are inadequate, the record fails to show that NMFS, the agency tasked with

20   identifying mitigation opportunities in the BiOp, ever told FEMA that mitigation was required to

21   offset the adverse effects of a specific development project. Thus, Plaintiff has not shown that

22   FEMA has failed to implement Element 6.

23

24                                        36

1    5.    RPA Element 7: Monitoring and Adaptive Management

2         Element 7 requires FEMA to report to NMFS annually. It provides that upon review of

3    FEMA's annual reporting, "NMFS will determine, in coordination with FEMA, if some alternate

4    actions or additional changes in RPA elements are needed to avoid jeopardy and adverse

5    modification of critical habitat." BiOp at 162. It further states that "[i]f NMFS determines that

6    adverse effects to channel and floodplain habitat were not avoided or not mitigated as a result of

7    NFIP actions, FEMA will ensure that mitigation . . . is provided . . . ." *Id.* This element "is only

8    checking on implementation of the program as it moves toward addressing more specifically the

9    primary effects of the mapping and minimum criteria elements of the program on listed salmon

10   and steelhead." *Id.* at 163.

11        To implement Element 7, FEMA first notified communities that they would be required

12   to report development permitting activity to FEMA. Dkt. # 86, Carey SJ Decl., ¶ 210. FEMA

13   then created and issued its NFIP-ESA "Reporting Tool," which was later revised to include

14   additional information. *Id.* at ¶ 211; *see also* SSAR 189. FEMA transmitted annual reports to

15   NMFS as it was required to do. Carey Decl., ¶¶ 209-14. The record demonstrates that FEMA and

16   NMFS were engaged in the review process and that NMFS recommended changes to the

17   Reporting Tool that FEMA then incorporated. *See* AR 1643. This back-and-forth communication

18   between the agencies was expressly contemplated by the plain language of Element 7. Plaintiff

19   has therefore failed to show that FEMA failed to comply with Element 7's reporting obligation.

20

21                                    **VIII. CONCLUSION**

22        NWF's challenges target the actions FEMA has taken to implement the RPA. FEMA has

23   demonstrated through the record why it believes that it has either complied with the RPA or why

24

                                          37

it lacks statutory authority to fully implement sub-elements of the RPA. The Court has

considered what the BiOp specifically requires of FEMA; what FEMA has done to implement

the BiOp; whether the NFIP satisfies the directives of the BiOp; and if the NFIP failed to satisfy

a particular RPA element, whether FEMA has articulated a rational basis for deviating from the

RPA. The Court concludes that Plaintiff has failed to demonstrate that FEMA's implementation

of the NFIP in the Puget Sound Region was an abuse of discretion or arbitrary and capricious

under the plain terms of RPA.

Having considered the motions, the responses and replies thereto, the declarations and

attached exhibits, and remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiff's Motion for Summary Judgment (Dkt. #74) is DENIED;

(2) Defendant FEMA's Motion for Summary Judgment (Dkt. #84) is GRANTED;

(3) Defendant Intervenor Cities Response/cross Motion (Dkt. #92) is GRANTED on the

grounds discussed above;

(4) The Clerk is directed to enter judgment in favor of Defendant FEMA.

DATED this 23rd day of October 2014.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE